**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| SCOTT MAINS, *et al.,* | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 5:20-cv-00112-JMG |
| | : | |
| THE SHERWIN-WILLIAMS COMPANY, | : | |
| d/b/a THE THOMPSON'S COMPANY, | : | |
| Defendant. | : | |

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                          **November 10, 2022**

Plaintiffs Scott and Andrea Mains' house caught fire hours after using Defendant The Sherwin-Williams Company's Thompson's WaterSeal Penetrating Timber Oil to stain their deck. State Farm insured Plaintiffs' home and contents. After the loss, State Farm paid a claim to Plaintiffs for the damages sustained, obtaining a subrogation of Plaintiffs' rights against third parties liable for the loss. Plaintiffs now claim Defendant is liable for the loss under claims of strict liability, negligence, and breach of the implied warranty of merchantability. Before the Court is Defendant's motion for summary judgment. For the following reasons, summary judgment will be granted in Defendant's favor.

## I.     FACTUAL BACKGROUND

### a.   The Fire

In Spring of 2019, Plaintiff Scott Mains sought to stain his wood deck with Defendant's WaterSeal Penetrating Timber Oil ("wood stain"). Joint App. at JA00014, ECF No. 85-3. A trained mechanic and mason, Mr. Mains owned his own business as a home remodeler while also working as a realtor. *Id.* at JA00015. Mr. Mains and his wife, Plaintiff Andrea Mains, purchased

their home in 2017.  *Id.* at JA00006.  Mr. Mains performed several home renovations, including cosmetic changes in the kitchen, painting, and flooring of the home.[1]  The home included an attached deck with flooring, rails, and a roof.  *Id.* at JA00010.  The deck had steps leading down to a concrete patio in the back of the house.  *Id.* at JA00012.  Mr. Mains remodeled the original structure of the deck by adding two lights in the ceiling, which was made of wood.  *Id.* at JA00010.

Mr. Mains bought one can of Defendant's wood stain at Lowe's a few months before he stained the deck.[2]  He never read instructions nor any cautions on the wood stain label.[3]  Mr. Mains later claimed none of the warnings, cautions, or instructions indicating the potential danger of the product had "jump[ed] out at [him]" when he bought the can.  *Id.* at JA00028.  Moreover, Mr. Mains also claimed he would have complied with any warnings and instructions had they jumped out at him.  *Id.* at JA00028.  Mr. Mains had "very limited" experience using wood stain prior to this project.  *Id.* at JA00027.  Mr. Mains later stated he did not have any notion wood stain or rags used for wood stain would be flammable.  *Id.*  Mr. Mains also stated, prior to the fire, he was unaware rags or other materials used during stain application could self-heat and spontaneously combust.  *Id.* at JA00028.

On June 8th, Mr. Mains began staining his deck with the wood stain.  *Id.* at JA00015.  In preparation, Mr. Mains cleared all items off the deck—including chairs, a table, a lounge set, and a propane grill—and placed them on the concrete patio.  *Id.* at JA00013.  His sister-in-law, Audrey

---

[1] *Id.* at JA00006.  Throughout painting for various projects in his house, Mr. Mains did not read the labels of paint products before using the products.  *Id.* at JA00007.

[2] *Id.* at JA00014-15.

[3] *Id.* at JA00015.  He also did not look up the wood stain product on the Internet. *Id.*

Perilli, came over to the house to help with staining.[4]  *Id.* at JA00015.  Ms. Perilli began staining

the deck around noon.  *Id.*  When Ms. Perilli arrived, Mr. Mains had already poured the wood stain

in a metal paint pan for her to use.  *Id.* at JA00047.  In fact, Mr. Mains supplied all the staining

tools, including old t-shirts rags to soak up excess stain.  *Id.* at JA00016-17; *see also id.* at

JA00040.  Ms. Perilli used rollers, a brush, and rags to apply the stain.  *Id.* at JA00015.  Ms. Perilli

did not know how to properly dispose of the wood stain materials and acknowledged the can of

wood stain would include disposal instructions.  *Id.* at JA00053.  But Ms. Perilli never had an

opportunity to read any information—including instructions or warnings—concerning the wood

stain because she never came into contact with the can.  *Id.*

     Mr. Mains later arrived around 4:00pm and began using the same application process to

cover up additional areas of the deck.  *Id.* at JA00016.  The pair poured the wood stain into a metal

paint tray and then used the rags and other tools to wipe up the stain and apply to the deck.  *Id.*;

*see also id.* at JA00041.  They listened to a radio plugged into an outlet on the house's exterior

while staining.  *Id.* at JA00011.  No other item remained plugged into an exterior outlet and no

candles sat on the deck.[5]

     Around 7:00pm, Mr. Mains and Ms. Perilli ran out of stain.  *Id.* at JA00017.  At that point,

they had used two t-shirt rags throughout the day and had cleared the paint tray of wood stain.  *Id.*

---

[4] *Id.* at JA00015.  Ms. Perilli had previous experience staining her mother's deck multiple years
prior.  *Id.* at JA00042.  When staining her mom's deck, Ms. Perilli did not read any instructions
on the stain can.  *Id.*  Nevertheless, Ms. Perilli later stated she was "sure [she] knew there were
instructions on there."  *Id.* at JA00043.

[5] *Id.*  A bug zapper sat placed on the deck but was not plugged in at the time of staining.  *Id.*  And
one extension cord remained attached to a pool pump.  *Id.* at JA00027.

Mr. Mains later described the rags as "pretty saturated" with stain.[6]  No wood stain remained in the can.  *Id.*  They then stored two t-shirt rags, two brushes, and two rollers—all the tools they used—in the metal paint tray, planning to return to finish the staining process upon buying more stain.  *Id.* at JA00017-18.  They did not clean off any of the tools prior to placing them in the tray. *Id.* at JA00018.  Mr. Mains then placed the tray on grass next to the staircase leading up to the deck.  *Id.*  At this time, Mr. Mains did not read any of the labels concerning cleaning up after staining.  *Id.* at JA00018-19.  The radio remained plugged in but powered off.  *Id.* at JA00028.

Mr. Mains returned to Lowe's to buy more wood stain, but the store had no more in stock. *Id.* at JA00019.  So Mr. Mains determined he would not continue staining the deck that night, instead opting to wake up in the morning and finish the staining process the next day.  *Id.*  He left the rags and other materials set off to the side of the steps to reuse them the next day.  *Id.*

Later that night, Mr. Mains watched television and showered while he waited up until Mrs. Mains returned from working an event around 11:00pm.  *Id.* at JA00020.  He then fell asleep.  *Id.* Mrs. Mains watched television on the couple's couch when she returned from work.  *Id.*  She then fell asleep on the couch in the living room, which was positioned on the inside of sliding doors leading outside.  *Id.*

Around 5:00am on Sunday, June 9th, Mr. Mains awoke to Mrs. Mains' screams about a fire outside the sliding glass doors.  *Id.*  Mr. Mains joined Mrs. Mains in the living room and saw flames outside the sliding doors, which he later described as "a big fireball."  *Id.*  Upon fleeing the home, Mr. Mains observed the entire deck, including its roof, in flames.  *Id.* at JA00021.  The fire

---

[6]  *Id.*  Ms. Perilli described the rags as "definitely covered."  *Id.* at JA00052.

had also spread to the house. *Id.* At the time of the fire, Mr. Mains and his children did not smoke, but his wife and sister-in-law both smoked. *Id.* at JA00026.

The township fire department responded to the fire and investigated its cause. Suppl. Joint App. at SJA00028. Officer James Alercia, a volunteer with the fire department with experience in firefighting and fire and arson investigations, responded to the Mains' fire in an operations role.[7] More specifically, Officer Alercia "continuously walked around the house and assisted with pulling ladders, pulling hose off trucks, [and] . . . instructing firefighters which direction to go or not go, what not to do." *Id.* at SJA00031. He began investigating once the firefighters extinguished the fire. *Id.* at SJA00032. He first interviewed Mr. and Mrs. Mains as the property owners. *Id.* Officer Alercia also diagrammed the deck and the location of the rag storage on the first step of the deck. *Id.* at SJA00034-35. From the scene of the fire, he collected an empty can of the wood stain, the metal frame of the paint roller, a melted blue plastic handle from the paint roller arm, and metal fragments of a paint brush. *Id.* at SJA00036. Officer Alercia contributed some of his observations of the incident in the Palmer Municipal Fire Department report. *Id.* at SJA00039. The fire department did not have an electrical engineer assess the house's wiring after the incident or otherwise inspect the house's electricity. *Id.* at SJA00068-70.

Following Officer Alercia's initial investigation, he met with Mr. Spadt, a cause and origin investigator for the insurance company covering Mr. and Mrs. Mains. *Id.* at SJA00049-50, SJA00052, SJA00060. Officer Alercia explained it is typical practice to meet with cause and

---

[7]  *Id.* at SJA00023-24. Officer Alercia further explained his operations role involved supporting the first responder in charge of the scene by "oversee[ing] the tactics that are being conducted in order to extinguish the fire." *Id.* at SJA00026-27. In his role, Officer Alercia often "respond[s] to fires and accidents or any type of fire call in the township[] [a]nd . . . take[s] incident command of that incident and manage[s] that incident." *Id.* at SJA00025.

origin investigators and describe to them the current status of the fire department's investigation before they proceed on their own investigation. *Id.* at SJA00052. Officer Alercia provided Mr. Spadt with all the evidence from the scene of the incident. *Id.* at SJA00053. Officer Alercia reported the towels or rags used sat in "direct sunlight." *Id.* at SJA00061. During their joint investigation, Officer Alercia and Mr. Spadt observed the base of the steps where the rags and other equipment had been left overnight only to find the tools "were no longer there[] [and] . . . were completely burned away." *Id.* at SJA00067.

Both Officer Alercia and Mr. Spadt contributed to the conclusion in the Township of Palmer's "Fire Cause and Origin Report." *Id.* at SJA00053; *see also id.* at SJA00005. In the Fire Cause and Origin Report, Officer Alercia consulted with Mr. Spadt to opine "heat from stained soaked towels drying in the sun" caused the fire. *Id.* at SJA00060; *see also id.* at SJA00010. Neither Officer Alercia nor Mr. Spadt reported any remnants of any towels or rags. *Id.* at SJA00067-68.

At the time of the fire, Mr. and Mrs. Mains maintained insurance from State Farm. *Id.* at JA00023. State Farm paid the Mains' insurance claims for the complete loss of their home and contents. *Id.* State Farm also covered the Mains' living expenses while they could not live at home—a period of a little over a year and a half.[8]

### b. The Product at Issue, Thompson's WaterSeal Penetrating Timber Oil Label

Defendant Sherwin-Williams manufactures the wood stain product at issue, Thompson's WaterSeal Penetrating Timber Oil. Def.'s Statement of Facts, ECF No. 85-2 ¶ 35. Thompson's

---

[8] *Id.* During this time period, Mr. and Mrs. Mains remained personally responsible for payments on their mortgage. *Id.*

WaterSeal Penetrating Timber Oil is a wood stain product.  *Id.*  The wood stain "has a flash point of 111.2 °F (44 °C) and is a combustible liquid."  *Id.* ¶ 36.  The product's label is apportioned in front, side, and back panels displaying various information.  The label's front panel provides, inter alia, warnings of "Danger!" and "Combustible!"  Joint App. at JA00072.  The front panel also provides the following instruction: "Before using, carefully read CAUTIONS on back panel."[9]  The label's back panel provide instructions for the product's application and disposal.  *Id.*  Specifically addressing the possibility of spontaneous combustion, the label's back panel provides:[10]

> **DANGER:** Rags, steel wool, other waste soaked with this product, and sanding residue may spontaneously catch fire if improperly discarded. Immediately place rags, steel wool, other waste soaked with this product, and sanding residue in a sealed, water-filled, metal container. Dispose of in accordance with local fire regulations.

And another portion of the back panel reads:[11]

---

[9] *Id.*  The warning is displayed in white font on a black background.  *Id.*

[10] The text reads:

> DANGER: Rags, steel wool, other waste soaked with this product, and sanding residue may spontaneously catch fire if improperly discarded.  Immediately place rags, steel wool, other waste soaked with this product, and sanding residue in a sealed, water-filled, metal container.  Dispose of in accordance with local fire regulations.

[11] The text provides:

> CONTAINS VOLATILE ORGANIC COMPOUNDS.  Contents are COMBUSTIBLE.  Keep away from heat and open flame.  VAPOR HARMFUL. Use only with adequate ventilation.  To avoid overexposure, open windows and doors or use other means to ensure fresh air entry during application and drying. If you experience eye watering, headaches, or dizziness, increase fresh air, or

CONTAINS VOLATILE ORGANIC COMPOUNDS. Contents are COMBUSTIBLE. Keep away from heat and open flame. VAPOR HARMFUL. Use only with adequate ventilation. To avoid overexposure, open windows and doors or use other means to ensure fresh air entry during application and drying. If you experience eye watering, headaches, or dizziness, increase fresh air, or wear respiratory protection (NIOSH approved) or leave the area. Avoid contact with eyes and skin. Wash hands after using. Keep container closed when not in use. Do not transfer contents to other containers for storage. FIRST AID: In case of eye contact, flush thoroughly with large amounts of water for 15 minutes and get medical attention. For skin contact, wash thoroughly with soap and water. In case of respiratory difficulty, provide fresh air and call physician. If swallowed, call Poison Control Center, hospital emergency room, or physician immediately. DELAYED EFFECTS FROM LONG TERM OVEREXPOSURE. Contains solvents which can cause permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents can be harmful or fatal. WARNING: This product contains chemicals known to the State of California to cause cancer and birth defects or other reproductive harm. DO NOT TAKE INTERNALLY. KEEP OUT OF THE REACH OF CHILDREN.  2582 (6/14)

These warnings are displayed among numerous other images and blocks of text covering the wood stain can label.  *Id.*

### c.   The Litigation

On January 7, 2020, Plaintiffs Scott and Andrea Mains sued Defendant Sherwin-Williams for claims of strict liability, negligence, and breach of implied warranty.  Pl.'s Am. Compl., ECF

---

wear respiratory protection (NIOSH approval) or leave the area.  Avoid contact with eyes and skin.  Wash hands after using.  Keep container closed when not in use.  Do not transfer contents to other containers for storage.  FIRST AID: In case of eye contact, flush thoroughly with large amounts of water for 15 minutes and get medical attention.  For skin contact, wash thoroughly with soap and water.  In case of respiratory difficulty, provide fresh air and call physician.  If swallowed, call Poison Control Center, hospital emergency room, or physician immediately. DELAYED EFFECTS FROM LONG TERM OVEREXPOSURE.  Contains solvents when can cause permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents can be harmful or fatal.  WARNING: This product contains chemicals known to the State of California to cause cancer and birth defects or other reproductive harm. DO NOT TAKE INTERNALLY. KEEP OUT OF THE REACH OF CHILDREN.

No. 36 at ¶¶ 12–42.  Plaintiffs allege their home spontaneously combusted after they applied Defendant's wood stain product to their deck.  *Id.* at ¶¶ 5–10.

The Parties had many periods of disagreements throughout discovery.  *See generally* Mot. for Sanctions Mem. Op., ECF No. 68.  The Parties initially disputed the scope of discovery concerning the product at issue.  On April 7, 2021—early on in the case—the Court ordered the entry of a confidentiality and protective order because the matter "implicate[s] Sherwin-Williams' confidential trade secrets and other proprietary information."  ECF Nos. 25, 26.  Plaintiffs' requested discovery of products similar to the wood stain product at issue.  *See generally* ECF No. 46.  After two discovery conferences, the Court ultimately denied Plaintiffs' request for discovery of similar products as untimely, vague, overbroad, and without technical support.  *See id.*; *see also* ECF Nos. 33, 45.

In September of 2021, the Court set a scheduling order denoting all fact and expert discovery must be completed no later than December 30, 2021.  ECF No. 37.  Plaintiffs continued to challenge Defendant's responsiveness to their requests for production.  *See generally* ECF No. 53-1.  In doing so, Plaintiffs' counsel filed an affidavit "plac[ing] in the public record certain Sherwin-Williams confidential product composition information."  ECF No. 62-1 at 4.  The affidavit was later removed.  ECF No. 42.  The Court held a status conference with the Parties.  *See* ECF No. 50.  On January 12, 2022, the Court stayed the matter pending resolution of the discovery disputes.  ECF No. 52.

Two months after the initial improper filing, Plaintiffs' counsel "placed information marked 'confidential' under the Protective Order on the public docket."  ECF No. 62-1 at 4.  The exhibit with confidential information was later removed from the docket.  ECF Nos. 54-55.

Defendant moved for sanctions after Plaintiffs' second instance improperly filing confidential documents.  ECF No. 62.  In response, the Court found Plaintiffs' counsel in civil contempt for violating the confidentiality and protective order on May 6, 2022.  ECF No. 68 at 4. Defendant requested "terminating sanctions and dismissal of this lawsuit."  ECF No. 62-1 at 9. The Court declined to dismiss the lawsuit, and instead imposed monetary sanctions, including attorney's fees and costs, as well as evidentiary sanctions.  ECF No. 68 at 7.  As an evidentiary sanction, the Court closed discovery on product composition "to protect against future discovery abuses, but also to ensure the expeditious resolution of this action."  *Id.* at 8.  Because discovery on product composition marked the final portion of outstanding discovery, the Court found *all* discovery had closed by May 6, 2022—over four months after the Court's discovery deadline.  *Id.* n. 4.

Nevertheless, months following the passage of deadlines and the imposition of sanctions, Plaintiffs' counsel requested the Court reopen the discovery period—three days before the Court's deadline concerning motions for summary judgment.  *See* ECF No. 86; *see also* ECF No. 80.  The Court denied Plaintiffs' request. ECF No. 87.

Defendant now moves for summary judgment on all of Plaintiffs' claims.  Defendant contends Plaintiffs' have not provided evidence sufficient to support their claims, particularly concerning the cause and origin of the fire at issue and the alleged defects of the wood stain product.  Plaintiffs again request the Court to allow them to present additional expert testimony. In the alternative, Plaintiffs submit they have provided sufficient factual evidence to support their claims.

## II.   SUMMARY JUDGMENT

### a.  Standard

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248).  "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting Anderson, 477 U.S. at 252).  Where, as here, "the non-moving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (internal quotation marks and citation

omitted); *see also Hollingsworth v. R. Home Prop. Mgmt.*, LLC, 498 F. Supp. 3d 590, 600 (E.D. Pa. 2020).

### b.  Strict Liability

Plaintiff brings strict liability claims under three different theories: defective/hazardous in design; defective manufacturing; and a "failure to warn" claim the label lacked conspicuous, proper, and adequate warnings.  *See generally* Pl.'s Am. Compl., ECF No. 36.  In Pennsylvania, "[s]trict liability allows a plaintiff to recover where a product in 'a defective condition unreasonably dangerous to the user or consumer' causes harm to the plaintiff.  *Phillips v. A-Best Prod. Co.*, 665 A.2d 1167, 1170 (1995) (citing Restatement (Second) of Torts § 402A (1965); *Webb v. Zern*, 220 A.2d 853, 854 (Pa. 1966) (adopting Restatement (Second) of Torts § 402A (1965)).  "There are three different types of defective conditions that can give rise to a strict liability claim: design defect, manufacturing defect, and failure-to-warn defect. *Id.* (citing *Walton v. Avco Corp.*, 610 A.2d 454, 458 (1992)).  All three types of strict liability claims require a plaintiff "establish only two things: that the product was sold in a defective condition 'unreasonably dangerous' to the user, and that the defect caused plaintiff's injury." *Id.*  (citing *Walton*, 610 A.2d at 458).

### i.  Failure-to-Warn Claim

Plaintiff first alleges Defendant is strictly liable for their injuries because Defendant's wood stain product possesses inadequate warnings.  Defendant argues Plaintiffs have no evidence of causation because Plaintiffs admit they never read the wood stain product label.  Defendant also

contends Plaintiff must put forward expert testimony to support this claim.[12]  Plaintiffs ask the

Court to permit them to supplement expert disclosures.  In the event the Court does not allow

---

[12]      Defendant also contends Plaintiffs' warning defect claims are preempted by the Federal
Hazardous Substances Act (FHSA).  Plaintiffs plead the wood stain label is inadequate because it
"failed to conform the subject stain product labeling to prevailing and safe industry and/or
government specifications . . . to adequately warn Plaintiffs . . . that the subject stain product and
byproducts thereof were susceptible to self-heating and/or spontaneous combustion."  Pl.'s Am.
Compl., ECF No. 36 ¶ 17.  "'The FHSA preempts any state cause of action that seeks to impose a
labeling requirement different from the requirements found in the FHSA and the regulations
promulgated thereunder.'"  *McGrath v. Rust-Oleum Corp.*, No. CIV.A. 12-1719, 2013 WL
2896966, at *3 (E.D. Pa. June 12, 2013) (citing *Richards v. Home Depot, Inc.*, 456 F.3d 76, 78 (2d
Cir. 2006).  "Conversely, a state cause of action may proceed if the plaintiff can show that the
labeling is non-compliant [with the FHSA's requirements]"  *Id.* (citing Richards, 244 F.3d at 78).
"Thus, a plaintiff may [only] assert a state law 'failure-to-warn claim based on the theory that a
product label failed to comply with the FHSA.'"  *Id.* (citing *Mwesigwa v. DAP, Inc.*, 637 F.3d 884,
887 (8th Cir.2011)).

       Defendant submits Plaintiffs' claim fails as a matter of law because the FHSA does not
require Defendant to include spontaneous combustion on the label as a principal hazard and thus
Defendant's labeling is compliant with the FHSA's requirements.  The FHSA provides labeling
requirements for hazardous substances.  *See* 15 U.S.C § 1261(p).  Section 1261(p) provides the
following requirements for labels on hazardous substances:

       . . . state[] conspicuously: the common or usual name or the chemical name . . . (C)
       the signal word 'DANGER' on substances which are extremely flammable,
       corrosive, or highly toxic; (D) the signal word 'WARNING' or 'CAUTION' on all
       other hazardous substances; (E) an affirmative statement of the principal hazard or
       hazards, such as 'Flammable', 'Combustible', 'Vapor Harmful', 'Causes Burns', .
       . . [and] (I) instructions for handling and storage of packages which require special
       care in handling or storage[.]

*Id.*; *see also Penwell v. Rust-Oleum Corp.*, No. 06-C-337 S, 2006 WL 3792660, at *2 (W.D. Wis.
Dec. 22, 2006).  So, "[w]here a hazardous substance fails to bear a label that complies with these
requirements, the FHSA denotes it a 'misbranded hazardous substance.'"  *McGrath*, 2013 WL
2896966, at *3 (citing 15 U.S.C § 1261(p)).

       Plaintiffs' challenge to the labeling here as noncompliant with the FHSA's requirements is
unpersuasive.  Defendant concedes the wood stain at issue "has a flash point of 111.2 °F (44 °C)
and is a combustible liquid."  Def.'s Statement of Facts, ECF No. 85-2 ¶ 36.  FHSA provisions
and related regulations provide "combustible" is a principal hazard to be identified on labels.  *See*
15 U.S.C § 1261(p).  Several federal courts have found spontaneous combustion is not a separate
principal hazard as defined by the statute.  *McGrath*, 2013 WL 2896966, at *8 (rejecting plaintiff's
argument an oil finish product is a "misbranded hazardous substance" by failing to reference
"spontaneous combustion" as a principal hazard); *State Farm Gen. Ins. Co. v. Sherwin-Williams
Co.*, No. 2:21-CV-00220-SVW-JC, 2021 WL 4913558, at *4 (C.D. Cal. July 26, 2021) ("Because

Plaintiffs to supplement their expert disclosures, which is the case here, Plaintiffs have indicated

they will not pursue this claim because they acknowledge the need for expert testimony.

     The Court agrees Plaintiffs have not put forward sufficient evidence to support a failure-

to-warn claim.  As Plaintiffs acknowledge, neither Mr. Mains nor Ms. Perilli read the warnings

displayed on the wood stain label.  *See id.* at JA00015; *id.* at JA00053.  But plaintiffs can establish

causation in failure-to-warn claims even where they failed to read or otherwise heed a warning.  In

*Conti v. Ford Motor Company*, the U.S. Court of Appeals for the Third Circuit found "liability

may . . . result when there is sufficient evidence that additional warnings or reminders may have

made a difference."  743 F.2d 195, 199 (3d Cir. 1984).  So plaintiffs must show "evidence in the

record to support a reasonable inference additional reminders may have forestalled" injury.  *Id.*

     Here, Plaintiffs do not offer any evidence additional warnings would prevent injury in this

case.  Ms. Perilli did not interact with the wood stain labels because Mr. Mains had already poured

the product in metal paint cans.  Joint App. at JA00047, JA00053.  And Mr. Mains had never

previously read warnings on product cans when working previous home remodeling projects.  *Id.*

at JA00007.  Although Mr. Mains testified he may have read warnings on the can if they had

"jumped out" at him, this speculative statement alone is insufficient to support Plaintiffs' claim.

*Id.* at JA00028.  And the Court declines to supplement Plaintiffs' expert disclosures at this time—

---

spontaneous combustion is not a principal hazard under the FHSA, no reasonable jury could find
that Defendants violated the FHSA by failing to identify a risk of spontaneous combustion on the
principal display panel of Defendants' containers."); *Penwell*, 2006 WL 3792660, at *2.  Here,
Defendant's label provides, inter alia, warnings of "Danger!" and "Combustible!" Joint App. at
JA00072.  This is sufficient to comply with the principal hazard text required by the FHSA's plain
language.  *See* 15 U.S.C. § 1261(p)(1)(E); 16 C.F.R. § 1500.121(b)(2)(ii).  Because spontaneous
combustion is not considered a principal hazard under the FHSA, Defendant is not in violation of
the statute for failing to identify a risk of spontaneous combustion on the front panel.  Plaintiffs'
failure-to-warn claim is preempted by the FHSA because Plaintiffs have not shown Defendant's
label fails to comply with the statute and its governing regulations.

months following the deadline and multiple Court orders providing similar directives. *See e.g.*, ECF Nos. 68, 69, 70, 87. So Plaintiffs present no expert testimony concerning their failure-to-warn claim. Because the Court declines Plaintiffs' latest request to supplement their expert disclosures, and Plaintiffs otherwise present insufficient evidence concerning the impact of additional warnings, summary judgement is appropriate on this claim.

### ii. Defective Design

Plaintiffs also allege product liability claims based on Defendant's defective design of the wood stain. In *Tincher v. Omega Flex, Inc.*, the Pennsylvania Supreme Court declined to adopt the Third Restatement of Torts in the context of design defect cases, so design defect strict liability claims remain pursuant to Section 402A of the Second Restatement of Torts. 104 A.3d 328 (Pa. 2014). So "[i]n order to prevail in a product liability case [for design defect], a plaintiff must establish: (1) that the product was defective; (2) that the defect existed when it left the hands of the defendant; and (3) that the defect caused the harm." *Davis v. Berwind Corp.*, 640 A.2d 1289, 1295 (1994), *aff'd*, 547 Pa. 260, 690 A.2d 186 (1997) (citing *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 898 (Pa. 1975) (abrogated on other grounds)); *see also Barris v. Bob's Drag Chutes & Safety Equip., Inc.*, 685 F.2d 94, 99 (3d Cir. 1982) ("To submit a section 402A strict liability case to a jury, it must be shown that the product was defective, that the defect existed while the product was in the control of the manufacturer or retailer, and that the defect was the proximate cause of decedent's injuries.").

In *Tincher*, the Pennsylvania Supreme Court found "a person or entity engaged in the business of selling a product has a duty to make and/or market the product—which 'is expected to and does reach the user or consumer without substantial change in the condition in which it is

sold'—free from 'a defective condition unreasonably dangerous to the consumer or [the consumer's] property.'" *Tincher*, 104 A.3d at 328 (citing Restatement (Second) of Torts § 402A(1) (1965). "To demonstrate a breach of duty in a strict liability matter, a plaintiff must prove that a seller (manufacturer or distributor) placed on the market a product in a 'defective condition.'" *Id.* at 384.

"Additionally, 'in Pennsylvania, the cause of action in a strict products liability requires proof . . . either of the ordinary consumer's expectations or of the risk-utility of a product.'" *Id.* at 401. So "[t]he plaintiff may prove the product is 'defective' by showing that either: (1) 'the danger is unknowable and unacceptable to the average or ordinary consumer' (the 'consumer expectations standard'); or (2) 'a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions' (the 'risk-utility standard')." *Nelson v. Am. Honda Motor Co.*, No. 118CV000210ERIE, 2021 WL 2877919, at *8 (W.D. Pa. May 17, 2021), *report and recommendation adopted*, No. 1:18-CV-210 SPB/RAL, 2021 WL 2646840 (W.D. Pa. June 28, 2021) (citing *Tincher*, 104 A.3d at 385-91). A plaintiff "only needs to prevail on one" theory to show a defect. *Id.* (citing *Tincher*, 104 A.3d at 391). But "even if a plaintiff can satisfy the first step and show—using either the consumer expectations test or the risk-utility test—that the product was defective, the plaintiff must also show that the alleged defect caused his injuries." *Wright v. Ryobi Techs., Inc*, 175 F. Supp. 3d 439, 453 (E.D. Pa. 2016).

Here, Plaintiffs contend the wood stain is defective under both the consumer expectations standard as well as under the risk-utility standard. Defendant submits Plaintiffs' product liability claim based on defective design is unable to proceed to trial because Plaintiff has no expert evidence to show the wood stain caused the fire at issue—a necessary element of a strict liability

claim premised on either standard.  The Court agrees Plaintiffs do not have sufficient evidence to show causation, and thus, Plaintiffs' design defect claim cannot proceed.

Concerning the consumer expectations test, Plaintiffs submit a jury could find the product is dangerous beyond a reasonable consumer's expectations because: (1) "the fire was caused by the spontaneous combustion of rags soaked in Defendant's product"; (2) Mr. Mains was unaware the stain could combust and cause a fire.  Pls.' Mem. in Opp. to Def.'s Mot. for Summ. J., ECF No. 88-3 at 11.  But expert testimony is generally required to establish fire cause and origin.  *See e.g.*, *State Farm Fire & Cas. Co. v. Holmes Prod.*, 165 F. App'x 182, 187 (3d Cir. 2006) (finding plaintiff failed to present facts sufficient to establish a material issue of fact regarding causation where a fire cause and origin expert's opinion was properly precluded); *State Farm Fire & Cas. Co. v. Cohen*, No. CV 19-1947, 2020 WL 5369626, at *2 (E.D. Pa. Sept. 8, 2020) (summary judgment entered in favor of defendant where plaintiff failed to produce expert report as to "cause of the fire"); *Dyvex Indus., Inc. v. Agilex Flavors & Fragrances, Inc.*, No. 12-CV-0979, 2018 WL 1428232, at *8 (M.D. Pa. Mar. 22, 2018) ("It is clear . . . [plaintiff] must have a cause and origin expert to provide an opinion to a reasonable degree to scientific certainty regarding the origin of the fire in its building as well as the cause of the fire."); *Chubb v. On-Time Wildlife Feeders*, 578 F. Supp. 2d 737 (M.D. Pa. 2008) (granting summary judgment where plaintiffs did not provide expert testimony on fire origin and cause).

In the present action, Plaintiffs did not identify an expert to show the wood stain at issue proximately caused the fire.  So Plaintiffs do not provide expert testimony concerning the cause of fire in this incident, instead relying on a fact witness, Officer Alercia—a volunteer firefighter who investigated the fire scene after the incident.  Plaintiffs did not offer Officer Alercia as an expert witness.  The testimony and observations of Plaintiffs and Officer Alercia alone are not

sufficient to prove the wood stain at issue caused the fire.  Without evidence to create a material

issue of fact regarding the wood stains cause of a fire through spontaneous combustion, a jury

could only speculate as to whether the wood stain product indeed caused the fire.  *Cf. Holmes*

*Prod.*, 165 F. App'x at 187.  Thus, summary judgment is appropriate concerning Plaintiffs'

defective design products liability claim.[13]

---

[13]     Even assuming Plaintiffs prove the causation element, it is unlikely they provide sufficient evidence to show a defective product.  Plaintiff also did not identify an expert nor provide expert testimony concerning whether the wood stain product is defective.  The U.S. Court of Appeals for the Third Circuit has found expert testimony is typically necessary to show a design defect in product's liability.  The U.S. Court of Appeals for the Third Circuit has found "[a]s a general principle, "[e]xpert evidence is not necessary ... if all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training of the subject under investigation."  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000) (citing *Padillas v. Stork-Gamco Inc.*, 186 F.3d 412 (3d Cir. 1999).  So "[a]lthough expert evidence is generally required in a products liability case where a defect is alleged, . . .  a defective condition may be established through non-expert evidence."  *Id.*  For example, in *Padillas*, the U.S. Court of Appeals found "a whirling cutting blade without a proper guard is obviously dangerous" and thus did not necessitate an expert opinion concerning the defective design's cause of injury.  *Id.*  On the other hand, in *Oddi*, the U.S. Court of Appeals considered whether "a juror could look at the front bumper and the flooring of the truck [the plaintiff] was driving and reasonably conclude, not only that its design was defective, but also that testing would have disclosed the defect."  *Id.*  The U.S. Court of Appeals found the truck at issue was "not at all like the chicken cutter with exposed blades in *Padillas*[,]" so Plaintiff needed expert testimony to show a defect.  *Id.* at 159-60.
        In the present action, the question of whether a wood stain's design is defective because improper disposal could lead to spontaneous combustion is more like the facts of *Oddi* than the "obviously dangerous" exposed blade in *Padillas*.  *See generally id.*  While there may be some instances when a defective condition can be established through non-expert evidence, that is not the case when, as here, the alleged defect requires particularized knowledge about the chemical components of a wood stain and its corresponding combustibility.  The average layperson cannot consider the design of the wood stain and determine whether the stain product was defective and unreasonably dangerous based on its chemical makeup or necessary disposal.  "Such conclusions are within the peculiar competence of experts."  *Id.* at 159.

### iii. Defective Manufacture

Plaintiffs also do not provide sufficient evidence to support a defective manufacture product liability claim.   As stated, a strict liability claim generally requires proof "(1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm." *Smith v. Howmedica Osteonics Corp.*, 251 F. Supp. 3d 844, 851 (E.D. Pa. 2017) (citing *Riley v. Warren Mfg., Inc.*, 455 Pa.Super. 384, 688 A.2d 221, 224 (1997)). As with their design defect claim, Plaintiffs' lack of a cause and origin expert is fatal to their defective manufacturer claim.   Even assuming Plaintiffs can satisfy the first steps and demonstrate the product was defective when it left the control of Defendant, Plaintiffs have not shown the wood stain product caused the fire beyond mere speculation.[14]   Summary judgment is therefore appropriate on this claim.

---

[14]    Plaintiffs also did not timely provide experts to speak to a manufacturing defect.  "In cases of a manufacturing defect, such expert testimony is certainly desirable from the plaintiff's perspective, but it is not essential." *Wiggins v. Synthes (U.S.A.)*, 29 A.3d 9, 15 (Pa. Super. 2011) (citing *Dansak v. Cameron Coca-Cola Bottling Co.*, 703 A.2d 489, 496 (Pa. Super. 1997)).  "A manufacturing defect may be established by direct evidence of 'a breakdown in the machine or a component thereof.'"   *Smith*, 251 F. Supp. 3d at 851 (citing *Riley*, 455 Pa. Super. 384). "Alternately, a manufacturing defect may be established by circumstantial evidence—sometimes referred to as a "malfunction theory"—where a plaintiff can rule out abnormal use or secondary causes of a malfunction." *Id.* (citing *Rogers v. Johnson & Johnson Prods., Inc.*, 565 A.2d 751, 754 (1989)).

So plaintiffs in manufacturing defect cases can rely on circumstantial evidence to show defect.  "Such circumstantial evidence includes (1) the malfunction of the product; (2) expert testimony as to a variety of possible causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same product; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that the accident does not occur absent a manufacturing defect." *Wiggins*, 29 A.3d at 15 (2011) (citing *Dansak*, 703 A.2d at 496).  Here, Plaintiffs contend the wood stain was defective and unreasonably dangerous due to its chemical composition and risk of spontaneous combustion.  ECF No. 88-3 at 3-4.  But Plaintiffs do not provide evidence of the product's malfunction beyond the observations of Mr. Mains, Ms. Perilli, and Officer Alercia.  Plaintiffs do not provide expert testimony as to the variety of possible causes.  Plaintiffs also do not show evidence of similar accidents of the same product.  And, as stated, Plaintiff has not shown the defect at issue caused the accident nor

### c. Negligence

Next, Plaintiffs allege Defendant acted negligently because Defendant owed a duty to act with reasonable care in the design, formulation, manufacture, testing, packaging, labeling, sale and/or distribution, of the subject stain product to provide a reasonable safe product and eliminate avoidable dangers.  Pl.'s Am. Compl., ECF No. 36 at 5-6.  Plaintiffs also contend Defendant negligently failed to give adequate warnings and/or instructions concerning safe disposal of materials.  *Id.* ¶ 27.  And "[a]s a direct and proximate result of the aforementioned negligence and carelessness of Sherwin-Williams, a fire occurred and Pl's sustained and incurred damage to their property."  *Id.* ¶ 31.  Defendant asserts Plaintiffs insufficiently prove causation concerning the fire cause and origin, as well as the inadequate warnings claim because Mr. Main failed to consult any warnings on the can.  The Court again finds Defendant's causation argument persuasive.

To prevail on a negligence claim in Pennsylvania, a plaintiff must establish the following four elements: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages."  *Prescott v. R & L Transfer, Inc.*, No. CIV.A. 3:11-203, 2015 WL 418736, at *4 (W.D. Pa. Feb. 2, 2015) (citing *Grossman v. Barke*, 868 A.2d 561, 566 (Pa. Super.2005)).  As with Plaintiffs' product liability claims, Plaintiffs are unable to establish causation without expert testimony on fire cause and origin.  *See Holmes Prod.*, 165 F. App'x at 187.  Here, Plaintiffs put forward Officer Alercia, a volunteer fireman, as a fact witness who concluded the wood stain-soaked rags at issue spontaneously combusted to cause a fire, which destroyed Plaintiffs' home.  Officer Alercia is not

---

eliminated other possible causes of the accident beyond speculation.  Therefore, it is likely—even looking beyond the causation issue—Plaintiffs have not put forward sufficient circumstantial evidence to support a manufacturing defect.

an expert on fire cause and origin and Plaintiffs failed to timely identify such an expert.  It is clear Plaintiffs must have a cause and origin expert to provide an opinion to a reasonable degree to scientific certainty regarding the origin of the fire as well as its cause.  This subject matter is outside the purview of a lay witness.  Summary judgment is therefore appropriate on this claim.

### d.  Implied Warranty of Merchantability

Plaintiffs also allege Defendant breached its implied warranty of merchantability. Plaintiffs contend Defendant violated implied warranties because "[a]t the time [Defendant] designed, formulated, manufactured, . . . packaged, labeled, marketed, sold, and/or distributed the subject stain product[,]" the product was not fit for its ordinary uses.  Pl.'s Am. Compl., ECF No. 36 at 8; *see also* 13 Pa.C.S. § 2314 (1980) (providing Pennsylvania's statutory requirements for merchantability standards of goods).  Plaintiffs also submit "the subject stain product functioned improperly in the absence of abnormal use and reasonable secondary causes."  Pl.'s Am. Compl., ECF No. 36 at 8.  So Plaintiffs allege breach of implied warranty of merchantability based on Defendant's design, manufacture, and labeling.

But Defendant's submit Plaintiffs' breach of warranty claims relating to the wood stain's labeling and packaging are preempted by the Federal Hazardous Substances Act (FHSA).  " . . . [A] plaintiff may [only] assert a state law 'failure-to-warn claim based on the theory that a product label failed to comply with the FHSA.'"[15]  15 U.S.C. § 1261(p)(1)(E) requires a label include "an affirmative statement of the principal hazard or hazards, such as "Flammable", "Combustible", Vapor Harmful", "Causes Burns", "Absorbed Through Skin", or similar wording descriptive of

---

[15] *McGrath*, 2013 WL 2896966, at *3 (citing *Mwesigwa v. DAP, Inc.*, 637 F.3d 884, 887 (8th Cir. 2011)).  For further discussion of Defendant's FHSA claim, *see supra* n. 10.

the hazard." *Penwell v. Rust-Oleum Corp*, No. 06-C-337 S, 2006 WL 3792660, at *2 (W.D. Wis. Dec. 22, 2006).  So, "[w]here a hazardous substance fails to bear a label that complies with these requirements, the FHSA denotes it a 'misbranded hazardous substance.'"  *McGrath v. Rust-Oleum Corp.*, No. CIV.A. 12-1719, 2013 WL 2896966, at *3 (E.D. Pa. June 12, 2013) (citing 15 U.S.C § 1261(p) (2008)).   FHSA provisions and related regulations provide "combustible" is a principal hazard to be identified on labels.  Defendant concedes the wood stain at issue "has a flash point of 111.2 °F (44 °C) and is a combustible liquid."  Def.'s Statement of Facts, ECF No. 85-2 ¶ 36. Defendant's label on the wood stain provide the signal word, "Danger!" and the principal hazard, "Combustible!" on the label's front panel.  Joint App. at JA00072.  This is sufficient to comply with the principal hazard text required by the FHSA's plain language.  *See* 15 U.S.C. § 1261(p)(1)(E); 16 C.F.R. § 1500.121(b)(2)(ii).  Moreover, the FHSA's requirements do not require a label to display warnings of spontaneous combustion because it is not a principal hazard as defined by the statute.[16]   Because Defendant's label complies with FHSA requirements and regulations, Plaintiffs cannot otherwise bring a state law claim of implied warranty of merchantability based on a failure-to-warn theory.

Next, Plaintiffs' allege Defendant breached its implied warranty of merchantability because of its improper design of the wood stain product.  Under Pennsylvania law, "the implied warranty of merchantability warrants that goods 'are fit for the ordinary purposes for which such goods are used.'"  *State Farm Fire & Cas. Co. v. Traditions of Am., LP*, No. 1:20-CV-01114, 2021 WL 8362166, at *9 (M.D. Pa. Dec. 28, 2021*), report and recommendation adopted*, No. 1:20-CV-01114, 2022 WL 1485186 (M.D. Pa. Jan. 28, 2022)  (citing 13 Pa. C. S. § 2314(b)(3)).  "To

---

[16] For further discussion on whether spontaneous combustion is a principal hazard under the FHSA, *see supra* n. 10.

establish a breach of [implied] warranty, plaintiffs must show that the equipment they purchased from the defendant was defective." *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992). "One way to demonstrate a defect is by the submission of circumstantial evidence." *Id.* (citing *Greco v. Bucciconi Eng'g Co.*, 407 F.2d 87, 89–90 (3d Cir.1969); *MacDougall v. Ford Motor Co.*, 214 Pa.Super. 384, 257 A.2d 676, 679–80 (1969), *overruled by implication on other grounds*, *REM Coal Co., Inc. v. Clark Equip. Co.*, 386 Pa.Super. 401, 563 A.2d 128 (1989)). "Under Pennsylvania law, a product may be found defective if it 'functioned improperly in the absence of abnormal use and reasonable secondary causes.'" *Altronics*, 957 F.2d at 1105 (citing *Greco*, 407 F.2d at 89-90)). "A product's defectiveness can [also] be proven by pointing to some specific dereliction by the manufacturer in constructing or designing the product . . . ." *Yachera v. Westminster Pharms., LLC*, 477 F. Supp. 3d 1251, 1268 (M.D. Fla. 2020) (citing *Zollars v. Troy-Built, LLC*, No. CIV.A. 10-924, 2011 WL 7102573, at *5 (W.D. Pa. Dec. 21, 2011), *adopted by* 2012 WL 253176 (W.D. Pa. Jan. 26, 2012)) (applying Pennsylvania law). So, "when the plaintiff's cause of action is breach of the implied warranty of merchantability, the elements of liability are similar to a strict liability action." *McKenna v. E.I. Du Pont DeNemours & Co.*, No. CIV.A. 87-2233, 1988 WL 71271, at *2 (E.D. Pa. June 30, 1988), *aff'd sub nom. McKenna v. E.I. DuPont DeNemours & Co.*, 866 F.2d 1411 (3d Cir. 1988)  (citing *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 95 (3d Cir. 1983)).

Because the Plaintiffs' implied warranty theories require proof of a defective product, the question becomes whether Plaintiffs have made a showing sufficient to establish the wood stain product was defective.  Plaintiffs allege the design and manufacture of the wood stain is defective because the product caused a fire upon disposal of wood-stain-soaked rags in metal painting cans. Defendant contends product defectiveness and merchantability are distinct concepts and thus, Mr.

Mains' successful staining of the deck—prior to the fire—show the product was properly sound for its designed purpose.[17]   Defendant also concedes the product is combustible; the wood stain's label warns of spontaneous combustion unless the product is properly discarded.   But Plaintiff does not put forward expert evidence to show the product caused the resulting fire.

Here, Plaintiffs allege the wood stain product is defective because it spontaneous combusted upon its disposal.   So the defect at issue occurred upon disposal of the wood stain product—not during its usage.   The instant matter presents facts similar to the plaintiff's breach of warranty action in *Barton v. Lowe's Home Centers, Inc.* 124 A.3d 349, 358 (Pa. Super. 2015).   In *Barton*, the Pennsylvania Superior Court found the plaintiff stated a valid cause of action for breach of warranty where they alleged a lawn mower burst into flame after it had been stored away after use.   *Id.* at 358.   The court reasoned "[i]t certainly is reasonable for a purchaser to expect a lawnmower to cut grass efficiently, but it also is reasonable to expect that it will not burst into flames after its first day of use, as it sits idly in the barn." *Id.*   So, like the lawnmower's owner, Plaintiffs ask the Court to find a product is defective because it spontaneously combusted after use.   But, unlike the plaintiff in *Barton*, who needed to show plausible allegations of a defect at the motion to dismiss stage, Plaintiffs in the instant matter must provide evidence showing a defect in the wood stain's design or manufacture caused the fire at issue.   And Plaintiffs have not put forward sufficient expert or circumstantial evidence to prove the product at issue caused the fire, let alone that a *defect* of the product at issue caused the fire.   Plaintiffs minimal evidence

---

[17]  Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 85-1 at 19.   Defendant does not raise the issue of whether Mr. Mains acted in abnormal use or whether reasonable secondary causes impacted the alleged defect or resulting injury.   *See generally id.*

concerning defect and causation is fatal where the alleged defect relies on the product lighting on fire.

Moreover, Plaintiffs have not shown, as a result of a manufacturing defect, the wood stain product "depart[ed] from its intended design." *Thomas ex rel. Thomas v. Staples, Inc.*, 2 F. Supp. 3d 647, 653 (E.D. Pa. 2014). Nor have Plaintiffs shown the design of the wood stain presented "foreseeable risks of harm . . . [that] could have been reduced or avoided by the adoption of a reasonable alternative design . . . and the omission of the alternative design renders the product not reasonably safe[.]" *Id.* at 653-54. At the summary judgment stage, a plaintiff's breach of warranty claim may fail where sufficient evidence is not introduced in the form of expert testimony nor circumstantial evidence. *See McKenna*, 1988 WL 71271, at *2. Because Plaintiffs have not put forward sufficient evidence of a defect, summary judgement is therefore appropriate on Plaintiffs' breach of warranty claim.

## III.    CONCLUSION

Summary judgment is warranted in Defendant Sherwin-Williams' favor because a reasonable jury could not find in favor of Plaintiffs' claims of strict liability, negligence, and implied warranty of merchantability concerning Defendant's wood stain product. An appropriate order follows.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

25